# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOAN HODAK <br> t/d/b/a AQUADOR, <br><br> Plaintiff, <br><br> vs. <br><br> JEDCO PRODUCTS, INC., <br> ULTIMATE SWIMMING POOLS, INC., <br> JERRY HODAK and <br> LINDA HODAK, husband and wife, <br><br> Defendants/Counterclaim Plaintiffs <br><br> vs. <br><br> JOAN HODAK, t/d/b/a AQUADOR, <br> and DAVID HODAK, <br><br> Counterclaim Defendants. | Civil Action No. 07-cv-0554 <br> Judge David S. Cercone <br><br> JURY TRIAL DEMANDED |

# OPINION

Cercone, D.J.

## I. INTRODUCTION

This case involves competing assemblies to seal swimming pool filters, also known as skimmers. Plaintiff Joan Hodak ("Plaintiff"), trading and doing business as Aquador, brings a claim for patent infringement against Defendants Jerry and Linda Hodak and the entites they operate ("Defendants"). Plaintiff specifically alleges that Defendants developed a skimmer sealing assembly that infringes a patent for a skimmer sealing assembly developed by Plaintiff's late husband, Frank Hodak. The Court has been asked to construe particular terms in the claims of U.S. Patent No. 5,285,538 ("the '538 patent") as required by law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996). On October 16, 2008, a *Markman* Hearing was held in which both parties masterfully presented their arguments for their proposed claim constructions. The Court's construction of the disputed terms is set forth below.

## II. FACTUAL BACKGROUND

Plaintiff, along with her late husband Frank Hodak, have been involved in the swimming pool business for many years. (Plaintiff's Opening Brief, Docket No. 45, at 1). Together they

operated the company Aquador. (*Id.*). Several of their children are also involved in the swimming pool business. (*Id.* at 2). Defendant Jerry Hodak never became involved in the operation of Aquador, but rather started his own swimming pool businesses, Jedco Products, Inc., and Ultimate Swimming Pools, Inc. (*Id.*).

In 1990, Frank Hodak applied for a patent on a swimming pool skimmer sealing assembly. The United States Patent and Trademark Office granted the patent application in 1992 as the '538 patent. Plaintiff is now the sole owner of the '538 patent. (Complaint, Docket No. 1, at ¶ 1). The invention consists of a faceplate that surrounds the opening of the skimmer and a flexible cover that attaches to the faceplate, thereby covering the central opening. By acting as a seal to the opening of the skimmer, this simple device allows swimming pool owners to drain their swimming pool filters in the winter without having to undertake the arduous process of draining the entire pool. (Plaintiff's Opening Brief, Docket No. 45, at 2).

Defendant Jerry Hodak developed another skimmer sealing assembly and likewise obtained a patent for it, U.S. Patent No. 7,011,747. The primary difference between the two devices is that Defendants' involves a central opening cover that is secured to the face plate by "a snap fit connection between cooperating mating elements disposed on the peripheral edge of the cover and the inner edge of the faceplate." (Defendants' Response Brief, Docket No. 46, at 3).

Plaintiff argues that Defendants' device infringes the '538 patent. The parties dispute the meaning of certain terms contained within Claim 1 of the '538 patent, namely "peripheral edge," "including peripheral edge extending therearound," and "sealing means."

**The Disputed Claim Terms**

The disputed terms appear in Claim 1 of the '538 patent as follows:

> 1. A sealing assembly for a swimming pool skimmer of the type having a skimmer body with a water receiving opening therein, said sealing assembly comprising:
>
>> a face plate for engaging said skimmer body around said water receiving opening at a sidewall of the swimming pool, said face plate defined by a frame-like element having a central opening therein communicating with the opening in the skimmer body, **said face plate having a substantially flat border surface extending**

> **around said central opening and including a peripheral edge extending therearound;**
>
> **sealing means** carried by the face plate; and
>
> a detachable cover element constructed of a flexible material comprising a planar portion for closing off the central opening in the face pate, said cover element further including an outwardly extending peripheral lip portion surrounding the planar portion for **sealably engaging the peripheral edge around said face plate** to prevent pool water from entering the skimmer.

(Emphases Added) (the '538 patent, Docket No. 45, Ex. A, col. 4, lns. 24-43).

The primary issue is whether, in light of the above claim language, the written description, and the file history, "peripheral edge" must be limited to mean only the outer edge of the faceplate. Defendant argues that the context of the claim terms themselves, certain language describing the preferred embodiments in the specification, and the prosecution history limit the meaning of "peripheral edge" to "outer edge of the face plate." (Defendants' Response Brief, Docket No. 46, at 7-8). They note that the specification describes the cover element of the device as "square or rectangular in shape, sized in plain view to fit snugly **around the peripheral edge 26 of the face plate."** (the '538 patent, Docket No. 45, Ex. A, col. 3, lns. 10-12) (emphasis added). Describing the "U-shaped peripheral lip portion" of the cover element, the specification states that the "U-shaped sides of the lip portion 27' are adapted to snugly engage opposed side of the raised flange 40 of the face plate completely **around the outer peripheral edge 26'**." (Docket No. 45, Ex. A, col. 3, lines 54-56) (Emphases added).

Plaintiff maintains that proper construction of the claim terms leads to the understanding that the term peripheral edge encompasses any edge on the face plate that is outside the central opening. In her view, the construction proffered by defendants is foreclosed by the claim language, the specification, the ordinary rules of grammar and the attendant principles of physics.

## III. LEGAL STANDARD

### A. Claim Construction

A literal patent infringement analysis involves two steps: the proper construction of the asserted claim and a determination as to whether the accused method or product infringes the asserted claim as properly construed. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976

(Fed.Cir. 1995), *aff'd.*, 517 U.S. 370 (1996). The first step, claim construction, is a matter of law. *See Id.*

It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed.Cir. 2004); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir. 1996) ("We look to the words of the claims themselves...to define the scope of the patented invention."). Additionally, the "written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." *Markman,* 52 F.3d at 980.

The words of a claim are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir. 2005) (citing *Vitronics*, 90 F.3d at 1582). The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313 (citations omitted). The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. *Id.* Because the inquiry is objective, "a court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Innova*, 381 F.3d at 1116.

A person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. *Phillips*, 415 F.3d at 1313. In other words, a court must not examine the ordinary meaning of a term "in a vacuum," but rather within the context of all of the intrinsic evidence, including the written description and prosecution history. *See Medrad, Inc. v. MRI Devices, Corp.*, 401 F.3d 1313, 1319 (Fed.Cir. 2005). In the written description, "a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582. Thus, to determine whether a patentee has defined a claim as inconsistent with its ordinary meaning, it is necessary to review the specification. *Id.*

4

The specification may reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Phillips*, 415 F.3d at 1316.

While a court must read claims in light of the specification, a court must not read limitations from the specification into the claim. *Id*. at 1323; *see also Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed.Cir. 2008) ("This court has cautioned against importing limitations from the specification into claims."). However, "the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." *Phillips*, 415 F.3d at 1323. This line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms. *Id.* For instance, although the specification often describes very specific embodiments of the invention, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") "has repeatedly warned against confining claims to those embodiments." *Id.* (citing *Nazomi Comm'cns Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed.Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification")).

In one line of cases the Federal Circuit has held that where a preferred embodiment described in the specification represents the only conceivable embodiment for an invention, then the claim terms should be construed according to the limitations of that embodiment. For example, in *Watts v. XL Systems, Inc.*, 232 F.3d 877 (Fed.Cir. 2001), the Federal Circuit examined the district court's construction of the term "sealingly connected" in a patent for pipe joints. It construed the term "sealingly connected" to be limited to structures utilizing misaligned taper angles because the term was expressly defined in the specification and prosecution history "as including only misaligned taper angles to effect a seal." *Id.* at 882. Similarly, in *Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed.Cir. 1999), the court had to determine whether the claim term "frame" was limited to a character-based protocol or could also include a bit-mapped protocol. The court limited the definition to the only embodiment described in the specification, a character-based protocol. *Id.* at 1382-83.

5

Finally, *Toro Co. v. White Consolidated Indus., Inc.*, 199 F.3d 1295 (Fed.Cir. 1999), involved an air inlet cover coupled with a restriction ring on a leaf blower. Toro's patent emphasized attaching the restriction ring to the air inlet cover. *Id.* at 1298. The accused product involved a restriction ring that was entirely separate from the air inlet cover. *Id.* The court held that because the specification described a structure whereby the restriction ring was "part of" the cover, in permanent attachment, the claim had to be construed narrowly to mean a cover that has the ring attached to it. *Id.* at 1302.

In another line of cases, the Federal Circuit has held that where a claim uses a term more broadly than it is used to describe particular embodiments appearing in the written description, then the particular embodiments are not to be used to limit the claim language which has a broader effect. *See Innova*, 381 F.3d at 1117. As Justice Bradley long ago stated, a claim term is not like a "nose of wax which may be turned and twisted in any direction, merely by referring to the specification." *Id.* (quoting *White v. Dunbar*, 119 U.S. 47, 51-52 (1886)). Even where a claim describes only a single embodiment, the claim should not be "read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebal-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 905-06 (Fed.Cir. 2004) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed.Cir. 2002)). In *Innova*, a case involving caps for water filtration tubes, the Federal Circuit rejected the defendant's argument that the claim term "operatively connected" was limited to connections having a "tenacious physical engagement" because the term was described as such in the specification. *Innova*, 381 F.3d at 1120. In rejecting the argument, the court noted that the defendant did not highlight any point in the written description that "*clearly and unmistakably* show[ed] the applicant's intent to limit the scope of the claims to tenacious physical engagement." *Id.* (emphasis added).

In a case involving competing devices used to dispense chemical reagents onto microscope slides, the defendant argued that the term "dispensing" in the plaintiff's patent claims was limited to "direct dispensing" because the written description disclosed only embodiments that described the direct dispensing mehtod. *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473

F.3d 1173 (Fed.Cir. 2006). The Federal Circuit disagreed, noting that it has "repeatedly warned against confining the claims to those embodiments." *Id.* at 1181 (citing *Innova*, 381 F.3d at 1123). The mere fact that the patent at issue disclosed embodiments that described the direct dispensing method did not by itself mean that the claims at issue were limited to the embodiments. *Ventana*, 473 F.3d at 1181. Essentially, because the inventors did not claim the direct dispensing method as part of their invention, the claim term "dispensing" was not to be construed as limited to "direct dispensing." *Id.*

In *Accumed LLC v. Stryker Corp.*, a dispute existed over the construction of the term "transverse holes" in a patent for orthopedic surgical nails. *Accumed LLC v. Stryker Corp.*, 483 F.3d 800 (Fed.Cir. 2007). The defendant argued that based on the embodiments disclosed in the written description, the term "transverse" should mean holes perpendicular to the nail shaft. *Id.* at 807. Once again the Federal Circuit disagreed, noting that the plain meaning of the claim term covered more than the particular embodiment. *Id.* The intrinsic evidence suggested that the patentees knew how to restrict their claim coverage to perpendicular holes. *Id.* There was, overall, very little indication that the patentees considered perpendicularity important to their invention, and nowhere did they criticize or distinguish tilted or non-perpendicular holes. *Id.* Accordingly, the court rejected the defendant's argument and held that the term should be given a broader meaning. *Id.* at 809.

### B. Means-plus-Function

Both parties agree that the claim term "sealing means" is in the "means-plus-function" format and is governed by 35 U.S.C. § 112. (Plaintiff's Opening Brief, Docket No. 45, at 9; Defendants' Response Brief, Docket No. 46, at 21). In construing a means-plus-function claim limitation, the function within the limitation must first be identified, then the written description must be examined to determine the structure that corresponds to and performs that function. *ACTV Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1087 (fed. Cir. 200 ). The function must be clearly linked to the structure. *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed.Cir. 2003).

Both parties further agree that the function identified in the term "sealing means" is to

block pool water from entering the skimmer assembly, and the corresponding structure can be a "raised bead" or "raised flange" carried by the face plate as well as a "lip portion" of the cover element that "includes a beveled protrusion constructed and arranged to first engage and then snap over" the raised bead or flange. (the '538 Patent, col. 4, lns. 44-50; col. 5, lns. 3-5; col. 6, lns. 1-4). The main dispute is over whether the sealing means may be anywhere on the face plate outside of the central opening as Plaintiff contends, or must be on the outer edge of the face plate as Defendants argue. The location of the sealing means, therefore, is linked directly to the construction of the term "peripheral edge." Accordingly, the construction of the claim terms "peripheral edge" and "peripheral edge extending therearound" is appropriate.

## IV. DISCUSSION

Plaintiff contends that the term "peripheral edge" should be defined to mean "any edge of the face plate that is peripheral to the central opening of the face plate," and the phrase "including a peripheral edge extending therearound" should be defined to mean "a peripheral edge that extends entirely around the central opening." (Docket No. 45 at 6-7). Defendants counter that the intrinsic evidence supports a definition of "peripheral edge" as "the outer perimeter of the face plate body that carries the sealing means," and "including a peripheral edge extending therearound" as "having a peripheral edge extending around the flat border surface of the face plate, the peripheral edge being the outer perimeter of the face plate body." (Defendants' Response Brief, Docket No. 46, at 8-9).

It must therefore be determined whether the term "peripheral edge" is limited to the outer-most edge of the face plate or may include an edge located at any point outside of the central opening of the skimmer assembly. Both Plaintiff and Defendants point to basic precepts of English grammar to support their respective definitions of "including a peripheral edge extending therearound" as used within the phrase "said face plate having a substantially flat border surface extending around said central opening and including a peripheral edge extending therearound." (Plaintiff's Opening Brief, Docket No. 45, at 7; Defendants' Response Brief, Docket No. 46, at 10).

At the very least, one skilled in the art of swimming pool skimmer assemblies would

understand that the claimed device must have an edge extending entirely around the central opening so that a cover element may be sealingly engaged to prevent pool water from entering the skimmer. Nevertheless, the question remains: must the location of that edge be limited to the outer edge of the face plate? The intrinsic evidence, namely the claim language itself, the language in the written description, and the file history must be examined to answer this question. *See Phillips*, 415 F.3d at 1313.

### A. The Language of Claim 1

Defendants contend that the context of the claim itself as well as language from the specification limit the term "peripheral edge" to only the outer edge of the face plate. In support they note that introduction of a claim term "provides antecedent basis" for further reference to that term. *See Energizer Holdings, Inc. v. ITC*, 435 F.3d 1366, 1370-71 (Fed.Cir. 2006). They argue that in the second full paragraph of Claim 1, the use of the definite article "the" prior to "peripheral edge around the face plate" indicates that the claim term "peripheral edge around said face plate" has been previously introduced in the claim. (Docket No. 46 at 9-10). Accordingly, the only way the term "peripheral edge around said face plate" could have been previously introduced is if the term "peripheral edge extending therearound" in the first full paragraph refers to the face plate. (*Id.*).

Plaintiff posits that as used in the clause in question, the word "therearound" is parallel to and means the same thing as the use of the words "around said central opening." (Reply Brief, Docket No. 47, at 6). She reiterates that in the context of Claim 1, the word "around" is always used to refer to the area around the central opening in order to emphasize that the primary purpose of the invention is to cover the central opening. (*Id.* at 6). Therefore, the only limitation on the term "peripheral edge" is that the "edge" be located "peripheral" to the central opening. (*Id.* at 7). Thus, according to Plaintiff, the "peripheral edge" can be either the "outer peripheral edge" or the "inner peripheral edge" of the frame-like face plate, which in any event is still peripheral to the central opening. (*Id.* at 7).

The language of claim 1 does not support defendants' position. The term "peripheral edge around said face plate" on column 4, lines 41-42 of the '538 Patent, refers back to the term

9

"peripheral edge" on column 4, line 34. Thus, as used in the first instance, the term "peripheral edge" is not clearly limited to the outer edge of the face plate.

Moreover, in the '538 Patent plaintiff did not attach any special meaning to the terms "peripheral" or "edge" as they are used in Claim 1. (Docket No. 47 at 8). Accordingly, the terms must be given their ordinary and plain meaning as understood by one skilled in the art.

Generally, the term "peripheral" refers to a positional relationship, something located outside of a bounded or central area. The Oxford Dictionary and Thesaurus defines peripheral to mean "of the periphery; on the fringe." The Oxford Dictionary and Thesaurus, American Edition (1996). Periphery in turn means "the boundary of an area or surface" or "an outer or surrounding surface." Id. Synonyms include circumferential, external, perimetric, outside, outer and border. Id. And as used in general parlance is not restricted to the outer-most part of a thing or device. For example, the phrase "peripheral vision" indicates the part of vision located on either side of the central gaze. Or in computer parlance, the word "peripherals" means devices outside of the Central Processing Unit, including the keyboard, mouse, monitor, printer, etc. Therefore, to one skilled in the art of swimming pool skimmer assemblies, something peripheral to the central opening may reasonably be anywhere beyond the central opening, and not necessarily limited to the outer-most edge of the faceplate.

Furthermore, the language of claim 1 does not explicitly limit the location of the "edge" to the outer border of the face plate. The only clear limitation as to the location of the "edge" is that it must be "carried by the face plate" beyond the central opening such that it can sealingly engage the cover element and seal the entire opening. (the '538 Patent, col. 4, lns. 29-45). The patentee could have used language in the claim that explicitly limited the location of the peripheral edge to the outer-most edge of the face plate but elected instead to use broader language. *See Accumed*, 483 F.3d at 807.

Even though the claim language itself does not explicitly limit the term "peripheral edge" to mean the outer edge of the face plate, the language of the claim must be further evaluated in light of the specification before reaching a definitive conclusion as to its proper construction. *See Vitronics*, 90 F.3d at 1582.

B.  The Specification

The specification describes the face plate as having a "substantially flat border surface surrounding the opening and laterally extending from the opening to a peripheral edge of the face plate." (the '538 Patent, col. 2, lns. 64-67). Defendants cite to numerous passages in the specification to support their contention that the location of this edge must be the outer perimeter of the face plate:

> The face plate has a flat border area 30 surrounding opening 28 and laterally extending from sidewall 32 of opening 28 to a peripheral edge of the face plate, see FIGS. 2, 3, and 4. ('538 Patent, col.2, lns. 64-67).
>
> The cover element is square or rectangular in shape, sized in plain view to fit snugly around the peripheral edges 26 of the face plate. ('538 Patent, col.3, lns. 10-12).
>
> The skimmer face plate 22' has an upstanding or raised flange 40 outwardly extending from the flat border surface 30' around the *outer peripheral edge* 26' thereof. As seen in FIG. 3, the flange 40 is substantially perpendicular to a plane defined by the flat border surface 30' of the face plate. ('538 Patent, col. 3, lns. 45-51) (emphasis added).
>
> The U-Shaped sides of the lip portion 27' are adapted to snugly engage opposed sides of the raised flange 40 of the face plate completely around the *outer peripheral edge* 26'. Additionally, the planar poriton 25' preferably engages the flat border surface 30' to provide secondary sealing when the cover element is in place. ('538 Patent, col. 3, lns. 54-60) (emphasis added).
>
> The face plate may carry a raised bead 36 or similar looking means formed around the *outer peripheral edge* 26. ('538 Patent, col. 3, lns. 65-67) (emphasis added).

Defendants assert that these are further evidence that the patent teaches only the art of securing a corner around the outer edge of the face plate.

The Federal Circuit has repeatedly warned against importing limitations from the specification into the claim and limiting claims only to the preferred embodiments. *See Phillips*, 415 F.3d at 1316; *Voda*, 536 F.3d at 1320. The only exceptions are where the specification contains words of "manifest exclusion or restriction" or the patentee intentionally disavows the scope of its invention. *See Leibal-Flarsheim Co.*, 358 F.3d at 905-06: *Phillips*, 415 F.3d at 1316.

The above-referenced language describes the preferred embodiments of Plaintiff's

11

invention, namely a skimmer assembly that includes a face plate that carries the sealing means along the outer perimeter of the face plate. But this language only identifies the preferred design of the invention; the specification contains no words of "manifest exclusion or restriction" that limit the invention to the preferred embodiments. Consequently, the language in the specification does not provide a basis for restricting the scope of the claim language. *See Liebal-Flarshiem*, 385 F.3d at 905 (noting that even where the specification describes only one embodiment, the claim should not be read restrictively unless the specification contains words of manifest exclusion or restriction); *Innova*, 381 F.3d at 1120 (same).

Furthermore, the specification makes clear that

> [t]he ... preferred embodiments described herein are meant to be illustrative only and not limiting as to the scope of the invention which is to be given the full breadth of the appended claims and any and all equivalents thereof.

(the '538 Patent, col. 4, lns. 17-21). Plaintiff has not, therefore, "intentionally disavowed" the scope of its invention in the specification. *Phillips*, 415 F.3d at 1316.

While the embodiments describe a device in which the cover element engages the sealing means along the outer perimeter of the face plate, the claim covers more than the specification. Plaintiff claims in the '538 patent a device that includes a frame-like face plate that surrounds the central opening to the swimming pool skimmer and also carries a means to completely seal that opening. The sealing means are located on an edge peripheral to the central opening. The embodiments describe the preferred design that does have the sealing means located along the outer perimeter of the face plate. However, the claim language does not make or implicitly require such a limitation. (the '538 Patent, col. 5, lns. 26-43).

Further, if the Court were to adopt Defendant's proposed claim construction, corresponding language in the specification would be rendered redundant and thus superfluous. The term "outer peripheral edge" (the '538 Patent, col. 3, lns. 46-47, 55-56) would then read "outer outer edge of the face plate." In other words, the use of the word "outer" would be rendered redundant because the concept already would be included through the use of the term peripheral. The patentee likely did not intend to include such redundant and thus superfluous

language when describing its claimed invention. The term "*outer* peripheral edge" itself contemplates the existence of an "*inner* peripheral edge." And as Plaintiff notes, the face plate resembles a picture frame in appearance, and a typical picture frame has both an outer and inner edge. (*See* Plaintiff's Reply Brief, Docket No. 47, at 3 n.1). Given the logical force of this analogy, we decline defendants' invitation to read the claim in a manner that produces an inconsistency in the provisions of the specification.

While the patent only discloses embodiments that describe a skimmer assembly with the sealing means located at the outer edge, the claim itself uses language that provides a broader effect, calling for a peripheral edge extending around the central opening. Given that (1) the claim language is of a broader scope than the language in the specification, (2) the specification does not contain words of manifest exclusion or restriction, (3) the patentee did not intentionally disavow the scope of the claim language, and (4) that reading the claim in the manner pressed by defendants would attribute the use of superfluous language without justification for doing so, the claim cannot be limited to the embodiment set forth in the specification. *Compare Accumed*, 483 F.3d at 807 (refusing to limit the particular claims to the preferred embodiments, even where the embodiments were the only description of the invention, because the claim language had a broader scope than the embodiments); *Ventana*, 473 F.3d at 1181 (same); *Innova*, 381 F.3d at 1120 (same).

The file history is considered part of the intrinsic evidence. Therefore, the file history of the '538 patent must be reviewed to examine the intrinsic evidence fully.

### C. The File History

The prosecution history of the patent is part of the intrinsic evidence. *See Medrad*, 401 F.3d at 1319. The patent examiner rejected Plaintiff's initial application because the term "associated with the face plate" was vague and indefinite and because the claim was obvious in light of two previous patents. (Plaintiff's Reply Brief at 10-11). Defendants contend that because Plaintiff argued during the application process that the prior art did not permit sealable engagement "around a peripheral edge of the face plate", the term "peripheral edge" is limited to the outer edge of the face plate. (Defendants' Response Brief, Docket No. 46, at 15).

13

Defendants accuse Plaintiff of trying to characterize the claims and the art in a manner different than she did during the patent prosecution. (*Id.*).

Plaintiff counters that she only amended the patent to include the term "carried by" in response to an examiner's rejection that the corresponding term "associated with" was vague and indefinite. (Docket No. 47 at 11). Further, by distinguishing its invention from the prior art, Plaintiff assertedly was arguing that the examiner's obviousness rejection was improper, and her current characterization is quite consistent with the patent prosecution. (*Id.*).

The pertinent language from the prosecution history is:

> Applicant takes issue with the Examiner's position and respectfully requests reconsideration in light of the following remarks.
>
> The device of Dengel et al. includes a rigid cover plate 30 and gasket 32 having a plurality of aligned holes formed therein to permit the insertion of threaded screws 34 therein for subsequent attachment to the faceplate 20 of the skimmer. Applicant has obtained a snap-on faceplate cover from Hayward Pool Products, Inc., Catalog No. SPX-1094R, and photographs of the part, along with its container, are enclosed herewith for the Examiner's information.
>
> The Hayward part depicted in the photograph is a square faceplate cover having an open interior. The part is adapted to be fitted over an existing screw-fitted faceplate in spas/hot tubs in order to cover the screw heads for cosmetic purposes. The inner throat portion of the faceplate cover surrounding the water opening carries a plurality of protrusions which apparently mechanically engage the interior walls of the pre-installed screw-fitted faceplate. It would appear that a mechanical, interface-type fit is established between the protrusions of the cover and the walls of the faceplate to hold the parts together. Thus, the Hayward part in no *way* seals the water opening in the preinstalled faceplate. As such, it is difficult to ascertain how or why the "snap-on" feature of the Hayward could be adapted to modify Dengal at al. [sic] The Dengel et al. cover has no open throat area to modify in the manner suggested by Hayward.
>
> In addition, neither of the cover elements of Dengel, et al. or Hayward are constructed of a flexible material to permit sealable engagement *around a peripheral edge of the faceplate*, as required by the claims. Dengel et al. has no peripheral lip, as claimed, to sealably engage *the peripheral edge of the faceplate*. In this regard, not that the plate 30 and gasket 32 of Dengel et al. are flat...Hayward has a peripheral lip, but it is rigid and inflexible and could not function to sealably engage *the peripheral edge of the faceplate*. It is, therefore, not seen how Dengel et al. could or would be modified by resort to the Hayward part to arrive at the

14

> claimed structure, other than by improper hindsight reconstruction. Clearly, the modified structure of Dengel, et al. (if it could be modified) would not perform in the same way as Applicant's claimed device since the rigid peripheral lip could not perform the necessary "sealable engaging" function as required in the claims (emphasis added).
>
> The various embodiments set forth in claims 2-9 are, likewise, not rendered obvious by the applied references. As stated above, these claimed features are not fairly suggested by Hayward since Hayward includes a rigid peripheral lip. Taken with Dengel et al.'s structure, which contains <u>no</u> peripheral lip, it is difficult to understand how the references can be combined to arrive at Applicant's claimed structure which all require...a flexible, peripheral lip.

(Letter of July 9, 1993, Defendants' Response Brief, Docket No. 46, Ex. 6).

In these remarks to the examiner, Plaintiff distinguishes her device from the Hayward and Dengel patents by highlighting the fact that her claimed invention uses a flexible cover element with a peripheral lip to sealably engage a peripheral edge of the faceplate, while the prior art uses a rigid peripheral lip or lacks a peripheral lip altogether. In doing so, plaintiff does not disavow the scope of the claim in any way, much less in one that limits the term "peripheral edge" to the outer edge of the face plate. *See Purdue Pharma L.P. v. Endo Pharms, Inc.*, 438 F.3d 1123, 1136 (Fed.Cir. 2006). To the contrary, throughout the specification and the above-referenced letter to the examiner, plaintiff was careful to signify that the flexible material forming the sealable engagement need only attach "around *a* peripheral edge of the face plate." The use of such language clearly indicates that there could be multiple peripheral edges available for sealability, and undermines defendants' attempt to restrict the construction of the claim language to only one possible location of the edge on the face plate. Absent such a clear and unmistakable disavowal, it cannot be said that Plaintiff is or was so limiting her claim. *Id.*; *see also Liebal-Flarshiem*, 385 F.3d at 905.

Moreover, Plaintiff did not rely on having a peripheral edge around the outer edge of the face plate to distinguish its invention from the prior art. Instead, it was argued in the application that the difference was in the cover elements: Plaintiff's invention utilized a cover element with a flexible peripheral lip that would sealingly engage the peripheral edge while the prior art cover elements had either a rigid peripheral lip or no peripheral lip to sealingly engage a peripheral

15

edge. (Docket No. 46, Ex. 6) ("[N]either of the cover elements of Dengel, et al., or Hayward are constructed of flexible material to permit sealable engagement around a peripheral edge of the faceplate, as required by the claims."). It follows that Plaintiff is not presently characterizing the claims and art in a materially different manner. Because there was no clear and manifest disavowal of claim scope and because Plaintiff did not rely on the peripheral edge being located along the outer-most edge of the face plate to distinguish her device from the prior art, it is apparent that Plaintiff did not limit her claim during the patent prosecution process to encompass a peripheral edge only around the outer edge of the face plate.

## V. CONCLUSION

Based on the above, the disputed claim terms will be construed as follows:

**"Peripheral Edge"** - any edge of the face plate that is peripheral to the central opening of the face plate;

**"Peripheral Edge Extending Therearound"** - a peripheral edge that extends entirely around the central opening**;**

Because this Court finds no limitation that the sealing means must be located around the outer-most edge of the face plate, it will define the term **"sealing means"** as follows: a flange, bead, or sidewall on the face plate, and a lip of the cover element, which combine to block water from entering the skimmer assembly, and equivalent structures that perform the same function.

An appropriate order will follow.

Date: February 25, 2009

/s David Stewart Cercone
David Stewart Cercone
United States District Judge

cc: Leland P. Schermer, Esquire
Michael G. Monyok, Esquire
Leland Schermer & Associates
Suite 711
11 Stanwix Street
Pittsburgh, PA 15222

16

Howard F. Messer, Esquire
Howard F. Messer, P.C.
100 Ross Street
Suite 101
Pittsburgh, PA 15219

David J. Porter, Esquire
Bryan H. Opalko, Esquire
Buchanan Ingersoll & Rooney PC
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219